***TIMOTHY L. DINAN (023232010)***
***LADDEY, CLARK & RYAN, LLP***
*Attorneys-at-Law*
*60 Blue Heron Road, Suite 300*
*Sparta, New Jersey 07871-2600*
*(973) 729-1880*
*Attorneys for Plaintiffs Jana Grace Rinaldi, f/k/a Jana Jackson f/k/a Jireh Woods and C.R., a minor, by and through FRANCESCO RINALDI and KATHERINE RINALDI, Guardians Ad Litem*

| | |
|---|---|
| JANA GRACE RINALDI, f/k/a JANA JACKSON f/k/a JIREH WOODS and C.R., a minor, by and through FRANCESCO RINALDI and KATHERINE RINALDI, Guardians Ad Litem<br><br>Plaintiff,<br><br>-vs-<br><br>THE STATE OF NEW JERSEY DEPARTMENT OF CHILDREN AND FAMILIES, THE STATE OF NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY f/k/a DIVISION OF YOUTH AND FAMILY SERVICES, IRMA AKCAY in her individual capacity and as a DYFS caseworker, ALISON CASSONE in her individual capacity and as a DYFS caseworker, KETTY WILLIAMS in her individual capacity and as a DYFS supervisor, JOHN JACKSON, CAROLYN JACKSON, THE STATE OF NEW JERSEY INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN ADMINISTRATORS 1-50 (true names being unknown), JOHN DOE CASEWORKERS 1-50 (individually and as DYFS or DCPP caseworkers, true names being unknown), JOHN DOE RESOURCE WORKERS 1-50 (individually and as DYFS or DCPP resource workers, true names being unknown), JOHN DOE INVESTIGATIVE WORKERS 1-50 (individually and as | CASE NO.: 2:26-cv-05694-JKS-JBC<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND** |

DYFS or DCPP investigative workers, true names being unknown), JOHN DOE SUPERVISORS 1-50 (individually and as DYFS or DCPP supervisors, true names being unknown), JOHN DOE MANAGERS 1-50 (individually and as DYFS or DCPP managers, true names being unknown), ABC CORPORATIONS 1-100 (true names being unknown), ABC EMPLOYEES (true names being unknown), ABC GOVERNMENT ENTITIES 1-100 (true identities being unknown), ABC GOVERNMENT EMPLOYEES 1-100 (in their individual capacities and as government employees 1-100),

Defendants.

Plaintiffs, JANA GRACE RINALDI, an adult female, and C.R., a minor female through her guardians ad litem ("GALs"), all of whom reside in Morris County, New Jersey, by way of Complaint against Defendants, say:

**INTRODUCTION**

1. This action arises from horrific physical abuse that Plaintiff Jana Grace Rinaldi ( "Jana") and Plaintiff C.R. (collectively "Plaintiffs"), suffered for approximately two years from 2008 until 2010 while they were placed under the custody and care of Defendants JOHN JACKSON and CAROLYN JACKSON (collectively "THE JACKSONS").

2. Jana and C.R. were improperly and negligently placed with THE JACKSONS during that time because the State of New Jersey Division of Child Protection and Permanency f/k/a the Division of Youth and Family Services ("DCPP") and its employees, workers, supervisors, managers, agents and affiliates failed to adhere to the requirements of the Interstate Compact on the Placement of Children

("ICPC"), failed to properly assess and interview THE JACKSONS and inspect their residence before placing Jana and C.R. with THE JACKSONS, failed to properly investigate prior child welfare and/or child protection complaints against THE JACKSONS before and during Jana and C.R.'s placements with THE JACKSONS, and failed to properly supervise Jana and C.R. while in the care and physical custody of THE JACKSONS to ensure they were protected and adequately cared for.

3. Shortly before Jana and C.R.'s placement with THE JACKSONS, Saint Clares Hospital ("St. Clares") and Morristown Memorial Hospital ("MMH") treated the Jackson's other adopted son J.J. for Failure to Thrive ("FTT") and toxic levels of sodium, the cause of which was inconclusive.

4. A proper investigation and analysis of J.J.'s medical records should have revealed that THE JACKSONS were mistreating, abusing and/or neglecting J.J. but this analysis was not done, was ignored or was grossly incompetent, which resulted in (i) THE JACKSONS being licensed as foster/resource parents, (ii) Jana and C.R. being placed under THE JACKSONS' custody and care despite J.J.'s suspicious death; and (iii) Damages sustained by Jana and C.R. for the subsequent misconduct committed by THE JACKSONS while Jana and C.R. were in their physical custody and care.

5. This action seeks to remedy violations of Plaintiff's Federal constitutional rights, State constitutional rights and State civil rights; and to remedy tortious conduct committed by the State of New Jersey's employees, agents and affiliates against the Plaintiff which is cognizable under the Tort Claims Act.

6. This action also seeks to remedy the tortious conduct committed by JOHN JACKSON and CAROLYN JACKSON while Jana and C.R. were in their

physical custody and care.

7. This action further seeks to remedy tortious conduct by any individuals, pediatric medical providers, companies, employees, and professionals whose identities are not currently known that negligently or unlawfully provided or failed to provide pediatric medical care, child protection and child welfare services which caused Plaintiff significant, substantial and permanent injuries.

**PARTIES & JURISDICTION**

8. Jana Rinaldi is an adult female residing in New Jersey. Jana was born on April 1, 2006, as Jireh Ramona Woods in Indianapolis Indiana and transitioned between a series of foster homes before being placed within the custody of THE JACKSONS in June 2008 around the age of 2 years old in the Town of Dover, New Jersey.

9. C.R. is an adult female residing in New Jersey. C.R. was born on April 7, 2008, in Indianapolis Indiana and was initially placed under the custody and care of her maternal aunt before quickly transitioning to THE JACKSONS' care and custody around June 2008 at 2 months old to be with her older sister, Jana.

10. Defendant CAROLYN JACKSON was born on September 27, 1977, and at all times relevant to this action resided in the Picatinny Arsenal U.S. Military base in, Dover, New Jersey, and upon information and belief her residence was located at 108 Farley Lane. After being evaluated by DCPP, CAROLYN JACKSON was permitted to take physical custody of Jana and C.R. starting in June 2008 and became Jana and C.R.'s legal adoptive mother on or around July 23, 2009, until her parental rights were terminated in August 2012.

11. Defendant JOHN JACKSON was born May 4, 1975, and at all times relevant to this action maintained his primary family residence in the Picatinny Arsenal U.S. Military base in, Dover, New Jersey, and upon information and belief it was located at 108 Farley Lane. After being evaluated by DCPP, JOHN JACKSON was permitted to assume custody and caretaking responsibility for Jana and C.R. starting in June 2008 and became Jana and C.R.'s legal adoptive father on or around July 23, 2009, until his parental rights were terminated in August 2012. JOHN JACKSON was a major in the U.S. Army for over fifteen years.

12. THE JACKSONS were also adoptive parents to J.J., born on or around May 13, 2005, in Oklahoma. J.J. came with THE JACKSONS to Dover, New Jersey, in or around October 2007 for Defendant JOHN JACKSON'S military career.

13. St. Clares provided pediatric medical care to J.J. in Dover or Denville, New Jersey in March 2008 for an acute skin infection commonly referred to as Scalded Skin syndrome and then transferred J.J. to MMH for further consultation regarding J.J.'s diagnoses, which included FTT.

14. MMH provided pediatric medical care to J.J. in its PICU unit in Morristown New Jersey in March 2008 and its staff worked on investigating the causal factors for J.J.'s FTT diagnosis. The investigation was inconclusive though records reveal the resident and attending physician were engaged in a differential diagnosis that included an interview with Defendant CAROLYN JACKSON which was done to try and rule out caregiver ignorance or neglect as a causal factor.

15. J.J. passed away in the emergency department of St. Claires hospital in Dover, New Jersey, on May 8, 2008, while within THE JACKSONS' custody and under their care.

16. DCPP placed Jana and C.R. into THE JACKSONS' custody on June 18, 2008, a little over a month after J.J.'s suspicious death and their adoption was finalized around July 2009 at which time Jana's name temporarily changed to Jana Jackson, until it was finally changed to her current name around November 18, 2016; after the Jackson's parental rights were terminated with respect to both Jana and C.R. in August 2012.

17. At all relevant times, Defendants State of New Jersey Department of Children and Families ("DCF"), DCPP, and The State of New Jersey Interstate Compact on the Placement of Children Administrators 1-50 ("ICPC Admin") (collectively the "DCF DEFENDANTS") with principal corporate offices in Trenton, New Jersey and Newark, New Jersey, and with local offices throughout the 21 counties in New Jersey, were the New Jersey government entities or government actors responsible for oversight and protection of the health, safety, welfare and permanency of children that are within the borders of New Jersey or whom are being considered for placement within the borders of New Jersey. The DCF DEFENDANTS do business throughout the State of New Jersey, including in Morris County.

18. At all relevant times, Defendants IRMA AKCAY, ALISON CASSONE, JOHN DOE CASEWORKERS 1-50 ("CWs"), JOHN DOE RESOURCE WORKERS 1-50 ("RWs") and JOHN DOE INVESTIGATIVE WORKERS 1-50 ("IWs") (collectively the "CASEWORK DEFENDANTS") were employees or agents of the DCF DEFENDANTS or were otherwise acting under color of State law on behalf of the DCF DEFENDANTS and as part of the scope of their employment were directly responsible for the oversight and protection of Jana and C.R.'s health, safety, welfare and permanency both while Jana and C.R. were being placed into THE JACKSONS'

custody and while they actually were in their custody and under their care.

19. At all relevant times, Defendants KETTY WILLIAMS and JOHN DOE SUPERVISORS 1-50 ("SUPs") were employees of the DCF DEFENDANTS or were otherwise acting under color of State law on behalf of the DCF DEFNEDANTS and as part of the scope of their employment were responsible to monitor, guide and evaluate the CASEWORK DEFENDANTS and ensure they were competently trained, and that they were properly and lawfully completing their casework, so that Jana and C.R.'s health, safety, welfare and permanency would be adequately protected.

20. At all relevant times, Defendants JOHN DOE MANAGERS 1-50 ("MGRs") were employees of the DCF DEFENDANTS or were otherwise acting under color of State law on behalf of the DCF DEFENDANTS and as part of the scope of their employment were responsible to monitor, guide and evaluate the SUPs and ensure that the SUPs had the training and resources needed to properly and lawfully monitor the CASEWORK DEFENDANTS so that Jana and C.R.'s health, safety, welfare and permanency would be adequately protected.

21. Pursuant to N.J.S.A. 59:8-8-4 to -8, Plaintiff sent an Initial Notice of Claim to the State of New Jersey, DCF and the DCF DEFENDANTS that was filed on or about July 23, 2018, and was received by the DCF DEFENDANTS on or about July 26, 2018, when Jana was 12 years old and C.R. was 10 years old. Six months has elapsed and the claims remain unsatisfied.

22. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because the well-pleaded complaint contains allegations arising under Federal law.

23. Furthermore, venue is proper pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the evens giving rise to the claims occurred in New

Jersey.

**FACTUAL BACKGROUND: THE PLACEMENT, ABUSE, NEGLECT AND DEATH OF J.J.**

24. Plaintiffs repeat the allegations above as if set forth fully herein.

25. When moving to the Picatinny Arsenal U.S. Military base sometime around October 2007 THE JACKSONS brought with them their three biological children: John Jr. Jackson (DOB 12.26.1997), Cameron Jackson (DOB 4.22.1998), and Shavonne Jackson (DOB 12.12.2001) (collectively the "Biological Children").

26. THE JACKSONS' also brought with them their adopted son J.J. who was 2 years old at the time.

27. In New Jersey, in December 2007, J.J. started receiving treatment at Denville Pediatrics and was seen directly by Dr. Scott Vergano from that office.

28. In late March 2008 J.J. was diagnosed with and treated for a skin infection condition called Scalded Skin Syndrome by St. Clares.

29. St. Clares transferred J.J. to MMH's Pediatric Intensive Care Unit ("PICU") where he was treated for the skin infection.

30. On March 31, 2008, J.J.'s skin infection had mostly or fully resolved but J.J.'s PICU treatment team at MMH requested a consultation with then pediatric gastroenterology resident Dr. Jarrod Kucharski and his attending physician Dr. Nader Yousseff to investigate and complete a workup on J.J.'s FTT diagnosis (the "FTT Workup") because J.J. was under the 3rd percentile for weight.

31. As part of the FTT Workup Dr. Kucharski and Dr. Yousseff reviewed what medical records they could locate for J.J., including pediatric records from New

Jersey and some limited birth records from Oklahoma, and they interviewed CAROLYN JACKSON regarding J.J.'s diet and weight.

32. From the interview Dr. Kucharski learned that Defendant CAROLYN JACKSON was limiting J.J.'s bites at each meal to control his intake, even though she believed J.J. had been FTT since she had known him at 3 months old.

33. The hospital FTT Workup was ultimately inconclusive.

34. Just over a month later, on May 8, 2008, J.J. died at the St. Clares Emergency Room (ER) in Dover, New Jersey.

35. That same day the St. Clares ER doctor reported the death to Dr. Krekamey Craig of Denville Pediatrics because Dr. Scott Vergane was on vacation at the time.

36. The St. Clares ER doctor informed Dr. Craig that J.J. was possibly hospitalized due to a simple seizure, but the cause of J.J.'s death was ultimately unknown.

37. Dr. Craig also spoke to the medical examiner's investigator on May 8, 2008, and requested an autopsy but this request was initially denied because THE JACKSONS' refused.

38. On May 10, 2008, the medical examiner finally agreed to conduct an autopsy, but J.J.'s body had already been embalmed, and the autopsy was never completed because J.J. was cremated.

39. Dr. Craig was concerned that child abuse and neglect played a role in J.J.'s death and reported these concerns to the Morris County Prosecutor's Office by letter dated May 13, 2008.

40. Sometime in May 2008 the DCF DEFENDANTS opened an investigation into whether abuse or neglect was a factor in J.J.'s death.

41. This investigation was either never assigned a New Jersey Spirit ("NJS") ID number, it was under NJS Case ID# 10118094, it was under NJS Case ID# 12008334, or it was under a NJS Case ID# that does not appear in Jana and C.R.'s medical records or DCPP records.

42. The DCF DEFENDANTS closed the investigation into whether J.J. was abused or neglected shortly after his death, on or around May 23, 2008, finding that no abuse or neglect occurred and concluding that J.J. died of a seizure disorder, as was reported on his death certificate by the medical examiner.

43. At no point did the DCF DEFENDANTS ever re-open the investigation to follow-up on the concerns of Dr. Krekamey Craig and Denville Pediatrics or to follow-up on J.J.'s medical records from Oklahoma.

44. In 2008 the DCF DEFENDANTS and CASEWORK DEFENDANTS failed to obtain, adequately review and properly consider J.J.'s medical records from Oklahoma, from Denville Pediatrics, from St. Clares, and from MMH in their investigation into whether J.J. was abused and neglected.

45. In 2008 the SUPs and DEFENDANT KETTY WILLIAMS failed to monitor and guide the CASEWORK DEFENDANTS so that J.J.'s medical records were properly obtained, adequately reviewed and properly considered in the investigation into whether J.J. was abused or neglected.

46. In 2008 the MGRs failed to monitor and guide the SUPs and DEFENDANT KETTY WILLIAMS so that they would ensure that proper casework was done and J.J.'s medical records would be properly obtained, adequately reviewed and

properly considered in the investigation into whether J.J. was abused or neglected.

47. In 2008 the DCF DEFENDANTS and CASEWORK DEFENDANTS failed to properly and adequately interview THE JACKSONS, and their Biological Children, for the investigation into whether J.J. was abused and neglected.

48. In 2008 the SUPs and DEFENDANT KETTY WILLIAMS failed to monitor and guide the CASEWORK DEFENDANTS to ensure THE JACKSONS, and their Biological Children, were properly interviewed for the investigation into whether J.J. was abused and neglected.

49. In 2008 the MGRs failed to monitor and guide the SUPs and DEFENDANT KETTY WILLIAMS so that they would ensure that proper casework was done and THE JACKSONS, and their Biological Children, were properly and adequately interviewed for the investigation into whether J.J. was abused and neglected.

## FACTUAL BACKGROUND: THE PLACEMENT OF JANA AND C.R. WITH THE JACKSONS' AFTER J.J.'S DEATH

50. Plaintiffs repeat the allegations above as if set forth fully herein.

51. Jana and C.R.'s biological mother Brittany Woods was involved with the Indiana Department of Child Services for years and through that process was considering surrendering her parental rights in connection with Jana and C.R., in 2007 and 2008.

52. Sometime around late 2007, or sometime in early 2008, with prompting from the Indiana Department of Child Services the DCF DEFENDANTS opened an ICPC supervision case to evaluate THE JACKSONS as a prospective placement for Jana and C.R. both of whom had resided with THE JACKSONS previously along with Ms. Woods in Indiana.

53. Upon information and belief, the ICPC supervision case was opened in NJS under Case ID# 10118094 or it was opened under another NJS Case ID# that does not appear in Jana and C.R.'s medical records or DCPP records.

54. Also in 2008 the DCF DEFENDANTS and CASEWORK DEFENDANTS were engaged in a home study and evaluation process with THE JACKSONS in an effort to get them licensed as foster parents or resource parents in New Jersey under NJS Case ID# 10102403 or NJS Case ID# 10118094.

55. On or around June 18, 2008, Brittany Woods signed an identified surrender in Indiana allowing THE JACKSONS to adopt Jana and C.R. and they were placed into THE JACKSONS' custody in New Jersey around that time.

56. On or around October 14, 2008, only 5 months after J.J.'s death, Defendant IRMA AKCAY and Defendant ALISON CASSONE completed a home study for THE JACKSONS that ultimately licensed them as foster or resource parents in New Jersey and enabled them to keep custody of Jana and C.R. while being supervised by the DCF DEFENDANTS.

57. The placement of Jana and C.R. with THE JACKSONS in or around June 2008 should have been done pursuant to an ICPC process between Indiana Department of Child Services and the DCF DEFENDANTS.

58. The ICPC process for Jana and C.R. being placed in THE JACKSONS' custody in June 2008 was either improper or entirely disregarded and as a result none of the home study evaluations or licensing processes done by the CWs, RWs and CASEWORK DEFENDANTS in 2007, 2008 and 2009 properly or adequately considered J.J.'s death when evaluating if THE JACKSONS should be licensed or whether Jana and C.R. should be placed in their custody.

59. THE JACKSONS' adoption of Jana and C.R. was finalized in Indiana on July 23, 2009, and the DCF DEFENDANTS closed the Jackson's case on August 24, 2009.

60. In 2007, 2008 and 2009 the DCF DEFENDANTS, RWs and CWs failed to obtain, adequately review and properly consider Jana, C.R. and J.J.'s medical records from Oklahoma, from Indiana, from Denville Pediatrics, from St. Clares, and from MMH and failed to review the prior investigation into J.J.'s death for their evaluation of whether the Jackson's should be licensed and awarded custody of Jana and C.R..

61. In 2007, 2008 and 2009 the SUPs failed to monitor and guide the RWs and CWs to ensure that J.J.'s medical records and the investigation reports relating to his death were properly obtained, adequately reviewed and properly considered in their assessment of whether the Jackson's should be licensed and awarded custody of Jana and C.R..

62. In 2007, 2008 and 2009 the MGRs failed to monitor and guide the SUPs so that they would ensure that proper casework was done and J.J.'s medical records and the investigation reports relating to his death would be properly obtained, adequately reviewed and properly considered in their assessment of whether THE

JACKSONS should be licensed and awarded custody of Jana and C.R..

63. In 2007, 2008 and 2009 the DCF DEFENDANTS and CASEWORK DEFENDANTS failed to properly and adequately interview THE JACKSONS, and their Biological Children, about their family, history and J.J.'s death for the Home Studies and assessments done to determine whether the Jackson's should be licensed and awarded custody of Jana and C.R..

64. In 2007, 2008 and 2009 the SUPs and DEFENDANT KETTY WILLIAMS failed to monitor and guide the CASEWORK DEFENDANTS to ensure THE JACKSONS, and their Biological Children, were properly interviewed about their family, history and J.J.'s death as part of the Home Studies and assessments done to determine if the Jackson's should be licensed and awarded custody of Jana and C.R..

65. In 2007, 2008 and 2009 the MGRs failed to monitor and guide the SUPs and DEFENDANT KETTY WILLIAMS so that they would ensure that as part of proper casework THE JACKSONS, and their Biological Children, were properly and adequately interviewed about their family, history and J.J.'s death as part of the Home Studies and assessments done to determine if THE JACKSONS should be licensed and awarded custody of Jana and C.R..

66. In 2007, 2008 and 2009 the DCF DEFENDANTS, SUPs, DEFENDANT KETTY WILLIAMS and MGRs failed to ensure adequate communication between the CASEWORK DEFENDANTS, CWs, IWs and RWs which caused THE JACKSONS' Biological Children to not be interviewed and caused J.J.'s death to be improperly overlooked and dismissed during the ICPC and licensing processes that awarded THE JACKSONS custody of Jana and C.R..

67. In 2007, 2008 and 2009 the CASEWORK DEFENDANTS intentionally or negligently avoided communication between CWs, IWs and RWs which caused THE JACKSONS' Biological Children to not be interviewed and caused J.J.'s death to be improperly overlooked and dismissed during the ICPC and licensing processes that awarded THE JACKSONS custody of Jana and C.R..

**COUNT I**
**BATTERY AND ASSAULT AGAINST THE JACKSONS**

68. Plaintiffs repeat the allegations above as if set forth fully herein.

69. While under the age of 5 and in the custody of THE JACKSONS from 2008 until 2010 Jana sustained various forms of neglect, abuse and excessive corporal punishment, including assault with various implements, forced ingestion of spicy or unpleasant foods, forced ingestion of toxic levels of sodium, food and water depravation, delayed medical care and emotional cruelty.

70. At the times relevant herein, THE JACKSONS acted with the intent to make harmful and offensive contract with Jana's person.

71. At all times relevant herein, THE JACKSONS also acted with the intention to cause Jana apprehension of imminent harmful and offensive contact with her person.

72. While under the age of 3, and in the custody of THE JACKSONS from 2008 until 2010, C.R. sustained various forms of neglect, abuse and excessive corporal punishment including assault, forced ingestion of spicy or unpleasant foods, forced ingestion of toxic levels of sodium, food and water depravation, delayed medical care and emotional cruelty to the point that C.R. was admitted to St. Clares

Hospital in Dover on April 15, 2010, for a high fever, lethargy, jerky head movements and risk of seizure.

73. In January 2010 THE JACKSONS traveled from New Jersey to Indiana to visit relatives and while there C.R. was admitted to St. Vincent's hospital in Indianapolis for dangerously high sodium levels, a staph infection and a yeast infection on her mouth that ultimately required part of her lip to be surgically removed.

74. At all times relevant herein, THE JACKSONS acted with the intent to make harmful and offensive contact with C.R.'s person.

75. At all times relevant herein, THE JACKSONS also acted with the intention to cause C.R. apprehension of imminent harmful and offensive contact with her person.

76. Sometime around April 16, 2010, New Jersey DCPP received a call from MMH that C.R. was again suffering from medical issues that were unexplained and rose to the level of abuse or neglect, including dangerously high sodium levels, severe malnutrition, MRSA, a severe staph infection, fractures of the left arm and a skull fracture.

77. In response to the April 2010 call about C.R. from MMH, DCPP opened an investigation under NJS ID #12013710 and conducted an emergency removal of all THE JACKSONS children, placing C.R. with foster/resource parents Patricia and David K., and placing Jana with foster/resource parents Francesco Rinaldi and Katharine Rinaldi (collectively the "RINALDIS"), whom eventually assumed permanent custody of Jana and C.R.

78. Investigation ID #12013170 ultimately concluded that the allegations of abuse and neglect against THE JACKSONS was substantiated.

79. On August 22, 2012, the Honorable Michael Wright, J.S.C., entered an order terminating THE JACKSONS' parental rights as to Jana and C.R.

80. On July 8, 2015, THE JACKSONS were convicted of both conspiracy to endanger the welfare of a child and multiple substantive counts of endangering the welfare of a child.

81. On November 18, 2016, the Hon. Martiza Berdote Byrne, P.J.F.P. entered an order under FL-14-06-17 appointing the RINALDIS as Jana's Kinship Legal Guardians ("KLG") until the age of eighteen (18) years old.

82. Additionally, on November 18, 2016, the Hon. Maritza Berdote Byrne, P.J.F.P. entered an order for Judgment of Adoption of C.R. by the RINALDIS.

83. As a direct and proximate result of THE JACKSONS' acts as described herein, specifically abuse and neglect by from June 2008 until April 2010, which included assault with various implements, forced ingestion of spicy or unpleasant foods, forced ingestion of toxic levels of sodium, food and water depravation, delayed medical care and emotional cruelty, which ultimately caused Jana and C.R. to be physically harmed and/or experienced offensive contact with their persons

84. THE JACKSONS intentional misconduct proximately and directly caused Jana and C.R. to sustain serious and permanent injuries, including permanent loss of bodily functions, reduced earning capacity, mental anguish, and medical expenses in excess of $3,600.

WHEREFORE, Jana and C.R. demand judgment against THE JACKSONS individually and/or jointly, for compensatory damages, interest, attorneys' fees, costs of suit and such other relief as the court deems just and equitable.

**COUNT II**

**NEGLIGENCE AGAINST THE STATE OF NEW JERSEY, DCF DEFENDANTS, CASEWORK DEFENDANTS, SUPs and MGRs**

85. Plaintiffs repeat each and every allegation above as if set forth at length herein.

86. Since approximately October 2007 the DCF DEFENDANTS, CASEWORK DEFENDANTS, SUPs and MGRs were aware of THE JACKSONS and were evaluating their suitability as a potential placement for Jana and C.R.

87. Between the time the DCF DEFENDANTS first opened a case for THE JACKSONS and when they closed their investigation into J.J.'s death around May 23, 2008, the DCF DEFENDANTS and the CASEWORK DEFENDANTS, particularly the RWs, CWs and their SUPs, should have interviewed THE JACKSONS, interviewed their Biological Children, completed a comprehensive review of all the children's medical records and as appropriate spoken with the Biological Children's and J.J.'s pediatricians.

88. These interviews and medical record reviews were required under the New Jersey Department of Children and Families Child Protection and Permanency Policy Manual, Volume II and/or Volume IV or their then effective equivalents, but they either did not occur at all or were grossly inadequate which resulted in J.J.'s death and the abuse of the Biological Children not being properly considered when assessing if Jana or C.R. should be placed under THE JACKSONS' custody and care.

89. These interviews and medical record reviews also should have occurred due to the circumstances of an ongoing ICPC process and the death of J.J., which created a common law duty to complete them as a reasonable DCF or DCPP employee that was similarly situated would have.

90. However, the interviews and medical record reviews either did not occur at all or were grossly inadequate which resulted in J.J.'s death and the abuse of the Biological Children not being properly considered when assessing if Jana or C.R. should be placed under THE JACKSONS' custody and care.

91. Between the time the DCF DEFENDANTS first opened a case for THE JACKSONS and when Defendant IRMA AKCAY and Defendant ALISON CASSONE completed a Home Study of THE JACKSONS around October 14, 2008, the DCF DEFENDANTS and the CASEWORK DEFENDANTS, particularly the RWs, CWs and their SUPs, should have interviewed THE JACKSONS, interviewed their Biological Children, completed a comprehensive review of all the children's medical records and as appropriate spoken with the Biological Children's and J.J.'s pediatricians, including Dr. Krekamey Craig of Denville Pediatrics, and also including the medical examiner that evaluated J.J.'s death.

92. These interviews and medical record reviews were required under the New Jersey Department of Children and Families Child Protection and Permanency Policy Manual, Volume II and/or Volume IV or their then effective equivalents.

93. These interviews and medical record reviews also should have occurred due to the circumstances of an ongoing ICPC process and J.J.'s death, which created a common law duty to complete them as a reasonable DCF or DCPP employee would have.

94. These interviews and medical record reviews should have been analyzed, explained and memorialized in Jana and C.R.'s Home Study that was completed by DEFENDANT IRMA AKCAY and DEFENDANT ALISON CASSONE, and the SUPs and MGRs responsible for the study or studies should have ensured

such analyses were incorporated therein, but the analyses either were omitted from the final reports or they were grossly inadequate, which resulted in J.J.'s death and the abuse of the Biological Children not being properly considered when assessing if Jana and/or C.R. should be placed under THE JACKSONS' custody and care.

95. DEFENDANT KETTY WILLIAMS and the SUPs should have made sure the CASEWORK DEFENDANTS were adequately trained and possessed appropriate experience to complete the investigation into J.J.'s death and complete Jana and/or C.R.'s Home Study in October 2008, but the CASEWORK DEFENDANTS were not properly trained and did not have sufficient experience and so failed to properly consider J.J.'s death and the abuse of the Biological Children when assessing whether Jana or C.R. should be placed into or continue under THE JACKSONS' custody, care and guardianship from 2008 to 2010.

96. Under docket FC-14-144-10, and any other FN or FL docket where Jana or C.R. were one of the NJS Participants identified, the DCF DEFENDANTS, CASEWORK DEFENDANTS, SUPs and MGRs were responsible to directly or indirectly through their supervision of the casework report to the appropriate courts the results of their investigation into J.J.'s death and the basis for their conclusion that Jana and C.R. should be placed with THE JACKSONS despite J.J.'s death, but this reporting to the courts either did not occur or was grossly inadequate.

97. The DCF DEFENDANTS, CASEWORK DEFENDANTS, SUPs and MGRs owed Jana a common law duty to prepare, supervise and oversee their casework with sufficient clarity and competency to facilitate a proper judicial review of Jana's placements and they failed to satisfy this duty.

98. This failed or inadequate casework and reporting to the court was done by the DCF DEFENDANTS, CASEWORK DEFENDANTS, SUPs and MGRs knowingly and/or in a grossly negligent manner so the courts' orders would not complicate Jana and/or C.R.'s placement with THE JACKSONS or require more work to be done by the CASEWORK DEFENDANTS, SUPs or MGRs.

99. As a direct and proximate result of the foregoing breaches of duty by the DCF DEFENDANTS, CASEWORK DEFENDANTS, SUPs and MGRs, including negligent casework, negligent supervision, negligent management, negligent hiring and negligent training Jana and C.R. were abused and neglected by THE JACKSONS from June 2008 until April 2010, which included assault with various implements, forced ingestion of spicy or unpleasant foods, forced ingestion of toxic levels of sodium, food and water depravation, delayed medical care and emotional cruelty, which ultimately caused Jana and C.R. serious and permanent injuries including permanent loss of bodily functions, reduced earning capacity, mental anguish, and medical expenses in excess of $3,600.

100. Defendant DCF and DCPP are vicariously liable for the foregoing wrongful acts of the CASEWORK DEFENDANTS, SUPs and MGRs—as agents, servants, employees and/or representatives of DCF and DCPP—but only to the extent their acts were within the scope of their employment or retention.

101. The CASEWORK DEFENDANTS, SUPs and MGRs are individually liable to the extent any of their foregoing acts were outside the scope of their employment or retention by the DCF DEFENDANTS.

WHEREFORE, Jana and C.R. demand judgment against the DCF DEFENDANTS, CASEWORK DEFENDANTS, SUPs and MGRs individually and/or

jointly, for compensatory damages, interest, attorneys' fees, costs of suit and such other relief as the court deems just and equitable.

**COUNT III**
**NEGLIGENT SUPERVISION, TRAINING AND HIRING BY DCF DEFENDANTS, MGRs AND SUPs**

102. Plaintiffs repeat each and every allegation above as if set forth at length herein.

103. At all times relevant to this action DCF DEFENDANTS had a duty to properly hire, train, screen, retain and supervise their agents, servants, employees and/or representatives to ensure that they were competent, capable of properly competing investigative work and capable of properly completing casework consistent with applicable law, policies and professional standards to ensure the health, safety, welfare and protection of Jana and C.R..

104. At all times relevant to this action SUPs and MGRs had a duty to report on and advocate for proper hiring, training, screening, retention, supervision and management of the CASEWORK DEFENDANTS to ensure that they were competent, capable of properly completing direct casework consistent with applicable law, policies and professional standards to ensure the health, safety, welfare and protection of Jana and C.R..

105. At all times relevant to this action the DCF DEFENDANTS, SUPs and MGRs were negligent and breached their aforesaid duty of care in failing to, directly or indirectly by reporting and advocating to senior personnel, properly hire, train, screen, retain, supervise and manage employees, the CASEWORK DEFENDANTS, IRMA AKCAY in her individual capacity and ALISON CASSONE in her individual capacity.

106. As a direct and proximate result of the foregoing breaches of duty by the DCF DEFENDANTS, SUPs and MGRs Jana and C.R. were abused and neglected by THE JACKSONS from June 18, 2008, until April 2010, which included assault with various implements, forced ingestion of spicy or unpleasant foods, forced ingestion of toxic levels of sodium, food and water depravation, delayed medical care and emotional cruelty, which ultimately caused Jana and C.R. serious and permanent injuries including permanent loss of bodily functions, reduced earning capacity, mental anguish, and medical expenses in excess of $3,600.

WHEREFORE, Jana and C.R. demand judgment against the DCF DEFENDANTS, SUPs, MGRs and KETTY WILLIAMS for compensatory damages, interest, attorney's fees, costs of suit and such other relief as the Court deems just and equitable.

**COUNT IV**
**STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS AND U.S. §1983 VIOLATIONS**

107. Plaintiffs repeat each and every allegation above as if set forth at length herein.

108. At all times relevant to this action the CASEWORK DEFENDANTS, IWs, RWs and IWs were acting under color of New Jersey State law as employees and/or agents of the DCF DEFENDANTS.

109. During the ICPC process, when being evaluated for placement under THE JACKSONS' custody, care and supervision and when actually in the placement with THE JACKSONS Jana and C.R. both had a substantive federal constitutional

right to safety, bodily integrity and freedom from state-created dangers.

110. The DCF DEFENDANTS affirmatively exercised their authority to place Jana and C.R. under the custody, care and supervision of THE JACKSONS.

111. Due to the ICPC process, the death of J.J., and the Home Study completed in 2008, at the time Jana and C.R. were placed with THE JACKSONS the DCF DEFENDANTS and CASEWORK DEFENDANTS knew or should have known that THE JACKSONS posed a substantial and specific risk of harm to Jana and C.R.

112. Despite knowledge that J.J. had died under the custody, care and supervision of THE JACKSONS the DCF DEFENDANTS and CASEWORK DEFENDANTS deliberately and intentionally or with indifference licensed THE JACKSONS and placed Jana and C.R. with THE JACKSONS despite failing to conduct all necessary interviews and medical record reviews when investigating J.J.'s death and when completing Jana and C.R.'s Home Study, all of which was a violation of Jana and C.R.'s federal constitutional rights to freedom from state-created dangers and which was a violation of U.S.C. §1983.

113. The harm Jana and C.R. suffered, being abused and neglected by THE JACKSONS, was a clearly foreseeable result of the DCF DEFENDANTS and CASEWORK DEFENDANTS failing to properly investigate and consider J.J.'s death.

114. During the ICPC process, when being evaluated for placement under THE JACKSONS' custody, care and supervision and then while actually in the placement with THE JACKSONS Jana and C.R. had a procedural due process right to a fundamentally fair decision-making process and procedures that do not arbitrarily or capriciously ignore critical safety information.

115. The CASEWORK DEFENDANTS violated Jana and C.R.'s procedural constitutional due process rights and violated U.S.C. §1983 when they failed to provide a fundamentally fair process and were arbitrary and capricious in their rushed closure of the investigation into J.J.'s death, rushed completion of Jana and C.R.'s Home Study and rushed evaluation and licensing of THE JACKSONS without completing all necessary interviews and medical record reviews.

116. Jana and C.R. also had a right to personal safety and bodily integrity and to be free from arbitrary and capricious government action under Article I, Paragraph 1, of the New Jersey State Constitution and that right is broader and more expansive than their rights under the U.S. Constitution.

117. The arbitrary, capricious, deliberate and unconstitutional failure of the CASEWORK DEFENDANTS to complete the necessary medical record reviews and interviews in this case as part of the ICPC, Home Study and adoption processes violated Jana and C.R.'s rights under the New Jersey Constitution also.

118. As a direct and proximate result of the CASEWORK DEFENDANTS unconstitutional conduct Jana and C.R. suffered horrific physical abuse and neglect by THE JACKSONS which resulted in permanent physical injuries and ongoing substantial emotional pain, suffering, loss of enjoyment of life, reduced earning capacity, and significant medical costs and specialized care costs in the past, present and future.

WHEREFORE, Jana and C.R. demands judgment against the CASEWORK DEFENDANTS for compensatory damages, punitive damages, interest, attorney's fees, costs of suit and such other relief as the Court deems just and equitable.

**LADDEY, CLARK & RYAN, L.L.P.**
Attorneys for Plaintiffs

Dated: September 8, 2026 By:______________________
Timothy E. Dinan Esq.

## DESIGNATION OF TRIAL COUNSEL

**TO: ASSIGNMENT JUDGE**

In accordance with Rule 4:25-4, you are hereby notified that Timothy E. Dinan, Esq., of the law offices of Laddey, Clark & Ryan, L.L.P., is assigned to try this case.

## CERTIFICATION PURSUANT TO RULE 4:5-1

Pursuant to Rule 4:5-1, I hereby certify that I have no knowledge of any other pending actions or proceedings concerning the subject matter of this action. It is not anticipated at this time that there is any other party who should be joined in this action.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

## DEMAND FOR ANSWERS TO INTERROGATORIES

Plaintiffs hereby demand that defendants provide answers to Form Interrogatories as provided by the New Jersey Court Rules.

**DEMAND FOR PRODUCTION**

Plaintiffs hereby demands that Defendants DCPP, DCF, THE STATE OF NEW JERSEY, ABC CORPORATIONS 1-10 (true names being unknown), and JOHN DOES 1-10 (true names being unknown) furnish copies (electronic (if available) with metadata (if available)) of their files (including but not limited to any medical records, reports, photographs, videos, audio recordings, internal emails, memos, pleadings, transcripts, orders, texts, notes, notices, and correspondence) pertaining to Plaintiffs, as permitted by Rule 4:18-1, et seq. Should a right of privilege be asserted regarding the production of any of the above, please provide a privilege log.

**DEMAND FOR INSURANCE AGREEMENTS**

Plaintiffs hereby demand that Defendants furnish copies of any and all declaration pages that were or may have been in force on or about January 16, 2009, as permitted by Rule 4:10-2(b).

**LADDEY, CLARK & RYAN, L.L.P.**
Attorneys for Plaintiffs

Dated: September 8, 2026 By:______________________
Timothy E. Dinan, Esq.